RICHARD M. WOOLLEY, PLAINTIFF-APPELLANT, v. HOFFMANN–LA ROCHE, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.

Argued March 21, 1983—Decided May 9, 1985.

*Timothy G. Hagan,* a member of the Michigan bar, argued the cause for appellant (*Rabner & Allcorn,* attorneys; *Thomas Tucker,* on the briefs).

*Frederick C. Kentz, III,* argued the cause for respondent (*Crummy, Del Deo, Dolan & Purcell,* attorneys).

The opinion of the Court was delivered by

WILENTZ, C.J.

## I.

The issue before us is whether certain terms in a company's employment manual may contractually bind the company. We hold that absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an

employer even when the employment is for an indefinite term and would otherwise be terminable at will.

## II.

Plaintiff, Richard Woolley, was hired by defendant, Hoffmann-La Roche, Inc., in October 1969, as an Engineering Section Head in defendant's Central Engineering Department at Nutley. There was no written employment contract between plaintiff and defendant. Plaintiff began work in mid-November 1969. Some time in December, plaintiff received and read the personnel manual on which his claims are based.

In 1976, plaintiff was promoted, and in January 1977 he was promoted again, this latter time to Group Leader for the Civil Engineering, the Piping Design, the Plant Layout, and the Standards and Systems Sections. In March 1978, plaintiff was directed to write a report to his supervisors about piping problems in one of defendant's buildings in Nutley. This report was written and submitted to plaintiff's immediate supervisor on April 5, 1978. On May 3, 1978, stating that the General Manager of defendant's Corporate Engineering Department had lost confidence in him, plaintiff's supervisors requested his resignation. Following this, by letter dated May 22, 1978, plaintiff was formally asked for his resignation, to be effective July 15, 1978.

Plaintiff refused to resign. Two weeks later defendant again requested plaintiff's resignation, and told him he would be fired if he did not resign. Plaintiff again declined, and he was fired in July.

Plaintiff filed a complaint alleging breach of contract, intentional infliction of emotional distress, and defamation, but subsequently consented to the dismissal of the latter two claims. The gist of plaintiff's breach of contract claim is that the express and implied promises in defendant's employment man-

ual created a contract under which he could not be fired at will, but rather only for cause, and then only after the procedures outlined in the manual were followed.[1] Plaintiff contends that he was not dismissed for good cause, and that his firing was a breach of contract.

Defendant's motion for summary judgment was granted by the trial court, which held that the employment manual was not contractually binding on defendant, thus allowing defendant to terminate plaintiff's employment at will.[2] The Appellate Division affirmed. We granted certification. 91 *N.J.* 548 (1982).[3]

---

[1]According to the provisions of the manual, defendant could, and over the years apparently did, unilaterally change these provisions. Defendant concedes, for the purpose of these proceedings, that plaintiff's version of the provisions of the manual as of the date he was fired is accurate. At oral argument plaintiff's counsel claimed that defendant followed a fairly consistent pattern of firing only for cause and offered to prove that fact on remand.

[2]The termination provisions of the employment manual are set forth in the Appendix to this opinion. It may be of some help to point out some of the manual's general provisions here. It is entitled "Hoffmann-La Roche, Inc. Personnel Policy Manual" and at the bottom of the face page is the notation "issued to: [and then in handwriting] Richard Woolley 12/1/69." The portions of the manual submitted to us consist of eight pages. It describes the employees "covered" by the manual ("all employees of Hoffmann-La Roche"), the manual's purpose ("a practical operating tool in the equitable and efficient administration of our employee relations program"); five of the eight pages are devoted to "termination." In addition to setting forth the purpose and policy of the termination section, it defines "the types of termination" as "layoff," "discharge due to performance," "discharge, disciplinary," "retirement" and "resignation." As one might expect, layoff is a termination caused by lack of work, retirement a termination caused by age, resignation a termination on the initiative of the employee, and discharge due to performance and discharge, disciplinary, are both terminations for cause. There is no category set forth for discharge without cause. The termination section includes "Guidelines for discharge due to performance," consisting of a fairly detailed procedure to be used before an employee may be fired for cause. Preceding these definitions of the five categories of termination is a section on "Policy," the first sentence of which provides: "It is the policy of Hoffmann-La Roche to retain to the extent consistent with company requirements, the services of all employees who perform their duties efficiently and effectively."

[3]Mr. Woolley died prior to oral argument before this Court. The claim for damages, while diminished, survives. See *infra* at 308.

### III.

Hoffmann-La Roche contends that the formation of the type of contract claimed by plaintiff to exist—Hoffmann-La Roche calls it a permanent employment contract for life—is subject to special contractual requirements: the intent of the parties to create such an undertaking must be clear and definite; in addition to an explicit provision setting forth its duration, the agreement must specifically cover the essential terms of employment—the duties, responsibilities, and compensation of the employee, and the proof of these terms must be clear and convincing; the undertaking must be supported by consideration in addition to the employee's continued work. Woolley claims that the requirements for the formation of such a contract have been met here and that they do not extend as far as Hoffmann-La Roche claims. Further, Woolley argues that this is not a "permanent contract for life," but rather an employment contract of indefinite duration that may be terminated only for good cause and in accordance with the procedure set forth in the personnel policy manual. Both parties agree that the employment contract is one of indefinite duration; Hoffmann-La Roche contends that in New Jersey, when an employment contract is of indefinite duration, the inescapable legal conclusion is that it is an employment at will; Woolley claims that even such a contract—of indefinite duration—may contain provisions requiring that termination be only for cause.

The trial court, relying on *Savarese v. Pyrene Mfg. Co.*, 9 *N.J.* 595 (1952), *Hindle v. Morrison Steel Co.*, 92 *N.J.Super.* 75 (App.Div.1966), and *Piechowski v. Matarese*, 54 *N.J.Super.* 333 (App.Div.1959), held that in the absence of a "most convincing[ ]" demonstration that "it was the intent of the parties to enter into such long-range commitments ... clearly, specifically and definitely expressed" (using, almost verbatim, the language of *Savarese, supra,* 9 *N.J.* at 601), supported by consideration over and above the employee's rendition of services, the employment is at will. Finding that the personnel policy manual did not contain any such clear and definite expression

and, further, that there was no such additional consideration, the court granted summary judgment in favor of defendant, sustaining its right to fire plaintiff with or without cause.

The Appellate Division, viewing plaintiff's claim as one for a "permanent or lifetime employment," found that the company's policy manual did not specifically set forth the term, work, hours or duties of the employment and "appear[ed] to be a unilateral expression of company policies and procedures ... not bargained for by the parties," this last reference being similar to the notion, relied on by the trial court, that additional consideration was required. Based on that view, it held that the "promulgation and circulation of the personnel policy manual by defendant did not give plaintiff any enforceable contractual rights." In so doing it noted the "objections to a lifetime employment contract that make it contrary to public policy, *i.e.,* lack of definiteness, unequal burden of performance, etc.," citing *Savarese, supra,* 9 *N.J.* at 600–01. While it did not purport to establish any special contractual rule concerning company personnel policy manuals, its analysis suggests they would ordinarily not lead to contractual consequences except for such provisions as those "involving severance pay," which "deal with a specific term of a contract. Its parameters are clearly set forth. The conditions and factors involved are definite and easily ascertained."

We are thus faced with the question of whether this is the kind of employment contract—a "long-range commitment"—that must be construed as one of indefinite duration and therefore at will unless the stringent requirements of *Savarese* are met, or whether ordinary contractual doctrine applies. In either case, the question is whether Hoffmann-La Roche retained the right to fire with or without cause or whether, as Woolley claims, his employment could be terminated only for cause. We believe another question, not explicitly treated below, is involved: should the legal effect of the dissemination of a personnel policy manual by a company with a substantial number of employees be determined solely and strictly by traditional con-

tract doctrine? Is that analysis adequate for the realities of such a workplace?

## IV.

As originally conceived in the late 1800's, the law was that an employment contract for an indefinite term was presumed to be terminable at will; an employee with an at-will contract could be fired for any reason (or no reason) whatsoever, be it good cause, no cause, or even morally wrong cause. Comment, "A Common Law Action For The Abusively Discharged Employee," 26 *Hastings L.J.*, 1435, 1438 (1975) [hereinafter cited as Comment, 26 *Hastings L.J.* 1435]. Pursuant to that rule, in New Jersey employers were free to terminate an at-will employment relationship with or without cause. *English v. College of Medicine and Dentistry of N.J.*, 73 *N.J.* 20, 23 (1977); *Schlenk v. Lehigh Valley R.R. Co.*, 1 *N.J.* 131, 135 (1948).

The at-will rule has come under severe criticism from commentators who argue that the economic justifications for the development of the rule have changed dramatically and no longer support its harshness. *See, e.g.*, Note, "Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith," 93 *Harv.L.Rev.* 1816 (1980) [hereinafter cited as Note, 93 *Harv.L.Rev.* 1816]; Comment, *supra*, 26 *Hastings L.J.* 1435; Comment, "Implied Contract Rights To Job Security," 26 *Stan.L.Rev.* 335 (1974). The Legislature here, as in most states, has limited the at-will rule to the extent that it conflicts with the policies of our various civil rights laws so that, for instance, a firing cannot be sustained in New Jersey if it is based on the employee's race, color, religion, sex, national origin, or age. *N.J.S.A.* 10:5–4; *see also* 42 *U.S.C.S.* § 2000e–1 to –15 (1970) (Title VII of the Civil Rights Act of 1964); 29 *U.S.C.S.* § 623 (1970) (Age Discrimination in Employment Act).

This Court has clearly announced its unwillingness to continue to adhere to rules regularly leading to the conclusion that an employer can fire an employee-at-will, with or without cause,

for any reason whatsoever. Our holding in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72 (1980), while necessarily limited to the specific issue of that case (whether employer can fire employee-at-will when discharge is contrary to a clear mandate of public policy), implied a significant questioning of that rule in general.

> Commentators have questioned the compatibility of the traditional at will doctrine with the realities of modern economics and employment practices.... The common law rule has been modified by the enactment of labor relations legislation.... The National Labor Relations Act and other labor legislation illustrate the governmental policy of preventing employers from using the right of discharge as a means of oppression.... Consistent with this policy, many states have recognized the need to protect employees who are not parties to a collective bargaining agreement or other contract from abusive practices by the employer.
>
> . . . .
>
> This Court has long recognized the capacity of the common law to develop and adapt to current needs.... The interests of employees, employers, and the public lead to the conclusion that the common law of New Jersey should limit the right of an employer to fire an employee at will.
>
> . . . .
>
> In recognizing a cause of action to provide a remedy for employees who are wrongfully discharged, we must balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing that they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees. [*Id.* at 66–67, 71 (citations omitted).]

The spirit of this language foreshadows a different approach to these questions. No longer is there the unquestioned deference to the interests of the employer and the almost invariable dismissal of the contentions of the employee. Instead, as Justice Pollock so effectively demonstrated, this Court was no longer willing to decide these questions without examining the underlying interests involved, both the employer's and the employees', as well as the public interest, and the extent to which our deference to one or the other served or disserved the needs of society as presently understood.

In the last century, the common law developed in a laissez-faire climate that encouraged industrial growth and approved the right of an employer to control his own business, including the right to fire without cause an employee at will.... The twentieth century has witnessed significant changes in socioeconomic values that have led to reassessment of the common law rule. Businesses have evolved from small and medium size firms to gigantic corporations in which ownership is separate from management. Formerly there was a clear delineation between employers, who frequently were owners of their own businesses, and employees. The employer in the old sense has been replaced by a superior in the corporate hierarchy who is himself an employee. We are a nation of employees. Growth in the number of employees has been accompanied by increasing recognition of the need for stability in labor relations. [*Id.* at 66 (citations omitted)].

The thrust of the thought is unmistakable. There is an interest to be served in addition to "freedom" of contract, an interest shared by practically all. And while "stability in labor relations" is the only specifically identified public policy objective, the reference to the "laissez-faire climate" and "the right to fire without cause an employee at will" as part of the "last century" suggests that any application of the employee-at-will rule (not just its application in conflict with "a clear mandate of public policy"—the precise issue in *Pierce* ) must be tested by its legitimacy today and not by its acceptance yesterday. *See also Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145 (1978) (at-will employee in public sector entitled, as a matter of constitutional right, to hearing prior to discharge).

Given this approach signaled by *Pierce, supra,* 84 *N.J.* 58, the issue is not whether the rules applicable to individual lifetime or indefinite long-term employment contracts should be changed, but rather whether a correct understanding of the "underlying interests involved," *supra* at 291, in the relationship between the employer and its workforce calls for compliance by the employer with certain rudimentary agreements voluntarily extended to the employees.

## V.

The rule of *Savarese, supra,* 9 *N.J.* 595, which the trial court and the Appellate Division transported to this case, was derived

in a very different context from that here. The case involved an unusual transaction not likely to recur (promise by company officer, made to induce employee to play baseball with company team, for lifetime employment even if employee became disabled as a result of playing baseball). Here, instead, we have the knowing distribution of an apparently carefully thought-out policy manual intended to cover all employees of a large employer. The courts below, however, despite this completely different situation, identified the claimed implied promise not to fire except for cause as purporting to establish an *individual* contract for lifetime or long-term employment for a particular employee. On that basis, they concluded that the stringent rule of *Savarese* was triggered.

As correctly read by the trial court and the Appellate Division, *Savarese* required that a long-term employment arrangement *such as was involved in that case* must be held to be an employment at will unless two distinct requirements are satisfied: there must be clear and convincing proof of a precise agreement, setting forth all of the terms of the employment, including, in addition to the duration thereof, the duties and responsibilities of both employee and employer; and the long-term undertaking by the employer must be supported by consideration from the employee in addition to his continued work. This reluctance to impose employment contracts other than at-will on employers is found in our cases both before and after *Savarese*. *See, e.g., Schlenk,* 1 *N.J.* 131 (1948); *Hindle v. Morrison Steel Co.,* 92 *N.J.Super.* 75 (App.Div.1966); *Piechowski v. Matarese,* 54 *N.J.Super.* 333 (App.Div.1959); *Bird v. J.L. Prescott,* 89 *N.J.L.* 591 (Sup.Ct.1916); *Shaw v. Woodbury Glass Works,* 52 *N.J.L.* 7 (Sup.Ct.1889). It should be noted, however, that each of these (except for *Schlenk* ) involved a particular contract between one employee and the employer, and its interpretation; none involved the question of the impact of a

contract put forth by the employer as applicable to all employees, similar to the policy manual in this case.[4]

We acknowledge that most of the out-of-state cases demonstrate an unwillingness to give contractual force to company policy manuals that purport to enhance job security. *See, e.g., Caster v. Hennessey,* 727 *F.*2d 1075 (11th Cir.1984); *Beidler v. W.R. Grace, Inc.,* 461 *F.Supp.* 1013 (E.D.Pa.1978), aff'd, 609 *F.* 2d 500 (3d Cir.1979); *Uriarte v. Perez-Molina,* 434 *F.Supp.* 76 (D.D.C.1977); *Schroeder v. Dayton-Hudson Corp.,* 448 *F.Supp.* 910 (E.D.Mich.1977), amended, 456 *F.Supp.* 650 (E.D. Mich.1978); *Heideck v. Kent Gen. Hosp., Inc.,* 446 *A.*2d 1095 (Del.1982); *Shaw v. Kresge,* 167 *Ind.App.* 1, 328 *N.E.*2d 775 (1975); *Johnson v. National Beef Packing Co.,* 220 *Kan.* 52, 551 *P.*2d 779 (1976); *Degen v. Investors Diversified Servs. Inc.,* 260 *Minn.* 424, 110 *N.W.*2d 863 (1961); *Gates v. Life of Montana Ins. Co.,* 638 *P.*2d 1063 (Mont.1982); *Mau v. Omaha National Bank,* 207 *Neb.* 308, 299 *N.W.*2d 147 (1980); *Chin v. American Tel. & Tel. Co.,* 96 *Misc.*2d 1070, 410 *N.Y.S.*2d 737 (Sup.Ct.1978). These cases, holding that policy manual provisions do not give rise to any contractual obligation, have to some extent confused policy manuals with individual long-term employment contracts and have applied to the manuals rules appropriate only to the individual employment contract. When there was such an individual contract before them (often consisting of oral assurances or a skeletal written agreement) not specifying a duration or term, courts understandably ruled them to be "at-will" contracts. They did so since they feared that by interpreting a contract of indefinite duration to be terminable only for cause, the courts would be saddling an employer with an employee for many years. In order to insure that the employer intended to accept the burdens of such an unusual "lifetime employment," the courts understandably in-

---

[4]Rarely mentioned in these cases is *Anthony v. Jersey Cent. Power & Light Co.,* 51 *N.J.Super.* 139 (App.Div.1958), *see infra* at 304, with its contrasting treatment of the contractual requirements where something similar to an employer's policy manual was distributed.

sisted that the contract and the surrounding circumstances demonstrate unmistakably clear signs of the employer's intent to be bound, leading to the requirements of additional independent consideration and convincing specificity.

Referring to these requirements, the Michigan Supreme Court noted:

> To the extent that courts have seen this rule as one of substantive law rather than construction, they have misapplied language and principles found in earlier cases where the courts were merely attempting to discover and implement the intent of the parties. [*Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 *Mich.* 579, 600, 292 *N.W.*2d 880, 885 (1980).]

*See also Pine River State Bank v. Mettille,* 333 *N.W.*2d 622, 628 (Minn.1983) (employee wrongfully terminated under provisions of employee handbook that was contractually binding on the employer).

Whatever their worth in dealing with individual long-term employment contracts, these requirements, over and above those ordinarily found in contract law, have no relevancy when a policy manual is involved. In that case, there is no individual lifetime employment contract involved, but rather, if there is a contract, it is one for a group of employees—sometimes all of them—for an indefinite term, and here, fairly read, one that may not be terminated by the employer without good cause.

More recently there have been some voices that sound this different note on the subject. See *Wagner v. Sperry Univac, Div. of Sperry Rand Corp.,* 458 *F.Supp.* 505 (E.D.Pa.1978), aff'd, 624 *F.*2d 1092 (3d Cir.1980); *Leikvold v. Valley View Community Hosp.,* 141 *Ariz.* 544, 688 *P.*2d 170 (1984) (en banc); *Pugh v. See's Candies, Inc.,* 116 *Cal.App.*3d 311, 171 *Cal.Rptr.* 917 (1981); *Toussaint v. Blue Cross & Blue Shield of Mich., supra,* 408 *Mich.* 579, 292 *N.W.*2d 880; *Pine River State Bank v. Mettille, supra,* 333 *N.W.*2d 622; *Weiner v. McGraw-Hill, Inc.,* 57 *N.Y.*2d 458, 457 *N.Y.S.*2d 193, 443 *N.E.* 2d 441 (1982); *Thompson v. St. Regis Paper Co.,* 102 *Wash.*2d 219, 685 *P.*2d 1081 (1984) (en banc); *see also Salimi v. Farmers Insurance Group,* 684 *P.*2d 264 (Colo.App.1984) (employee's

allegation that his demotion was a breach of contract based on procedures in the employment manual survives a motion to dismiss); *Kaiser v. Dixon*, 127 *Ill.App.*3d 251, 82 *Ill.Dec.* 275, 468 *N.E.*2d 822 (1984) (public employee entitled to notice and hearing before discharge as provided for in staff policy manual adopted by the village).[5] While the dividing line between these two groups of out-of-state cases may be explained by the different analyses of whether the requirements imposed by the law of contracts have been met, the results can also be explained by a difference in attitude, some courts continuing to be concerned with the adverse impact on employers of long-term employment contracts, while others are concerned with the adverse impact on employees when apparent commitments expressed in policy manuals are not honored.

What is before us in this case is not a special contract with a particular employee, but a general agreement covering all employees. There is no reason to treat such a document with hostility.

The trial court viewed the manual as an attempt by Hoffmann-La Roche to avoid a collective bargaining agreement.[6] Implicit is the thought that while the employer viewed a collective bargaining agreement as an intrusion on management prerogatives, it recognized, in addition to the advantages of an employment manual to both sides, that unless this kind of company manual were given to the workforce, collective bar-

---

[5] A recent article asserts that at least eighteen states have specifically held or pointed out in opinions that they recognize, to various extents, implied-in-fact contracts arising from employee manuals, other personnel policies, and/or oral or written representations regarding job security. F. Lopatka, "The Emerging Law of Wrongful Discharge—A Quadrennial Assessment of the Labor Law Issue of the 80's," 40 *Bus.Law.* 1, 17 (1984).

[6] The trial court, after noting that if Hoffmann-La Roche had been unionized, Woolley would not be litigating the question of whether the employer had to have good cause to fire him, said "[T]here is no question in my mind that Hoffmann-La Roche offered these good benefits to their employees to steer them away from this kind of specific collective bargaining contract...."

gaining, and the agreements that result from collective bargaining, would more likely take place.

A policy manual that provides for job security grants an important, fundamental protection for workers. *See* F. Tanenbaum, *A Philosophy of Labor* 9 (1951), *quoted in* L. Blades, "Employment At Will *vs.* Individual Freedom: on Limiting the Abusive Exercise of Employer Power," 67 *Colum.L.Rev.* 1404, 1404 (1967) [hereinafter cited as Blades]. If such a commitment is indeed made, obviously an employer should be required to honor it. When such a document, purporting to give job security, is distributed by the employer to a workforce, substantial injustice may result if that promise is broken.

We do not believe that Hoffmann-La Roche was attempting to renege on its promise when it fired Woolley. On the contrary, the record strongly suggests that even though it believed its manual did not create any contractually binding agreements, Hoffmann-La Roche nevertheless almost invariably honored it. In effect, it gave employees more than it believed the law required. Its position taken before us is one of principle: while contending it treated Woolley fairly, it maintains it had no legal obligation to do so.

## VI.

Given the facts before us and the common law of contracts interpreted in the light of sound policy applicable to this modern setting, we conclude that the termination clauses of this company's Personnel Policy Manual, including the procedure required before termination occurs, could be found to be contractually enforceable. Furthermore, we conclude that when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary, instead of "grudgingly" conceding the enforceability of those provisions, *Saverese, supra,* 9 *N.J.* at

601, should construe them in accordance with the reasonable expectations of the employees.

The employer's contention here is that the distribution of the manual was simply an expression of the company's "philosophy" and therefore free of any possible contractual consequences. The former employee claims it could reasonably be read as an explicit statement of company policies intended to be followed by the company in the same manner as if they were expressed in an agreement signed by both employer and employees. From the analysis that follows we conclude that a jury, properly instructed, could find, in strict contract terms, that the manual constituted an offer; put differently, it could find that this portion of the manual (concerning job security) set forth terms and conditions of employment.

In determining the manual's meaning and effect, we must consider the probable context in which it was disseminated and the environment surrounding its continued existence.[7] The manual, though apparently not distributed to all employees ("in general, distribution will be provided to supervisory personnel ..."), covers all of them. Its terms are of such importance to all employees that in the absence of contradicting evidence, it would seem clear that it was intended by Hoffmann-La Roche that all employees be advised of the benefits it confers.

We take judicial notice of the fact that Hoffmann-La Roche is a substantial company with many employees in New Jersey. The record permits the conclusion that the policy manual represents the most reliable statement of the terms of their employ-

---

[7]The somewhat meager record before us does not fully cover those facts. The eight pages of the manual submitted to the trial court and to us are just one part of the manual. We do not know, therefore, what other matters are covered, the extent to which they are covered, or whether they reinforce or call into question the binding nature of the terms which we deduce from that part of the manual that is before us. Since the matter was decided against plaintiff on motion for summary judgment, we shall assume that the manual's origin, dissemination, and continued existence is similar in context to that of the ordinary personnel policy manual, of which context we take judicial notice.

ment.   At oral argument counsel conceded that it is rare for any employee, except one on the medical staff, to have a special contract.   Without minimizing the importance of its specific provisions, the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment.   Having been employed, like hundreds of his co-employees, without any individual employment contract, by an employer whose good reputation made it so attractive, the employee is given this one document that purports to set forth the terms and conditions of his employment, a document obviously carefully prepared by the company with all of the appearances of corporate legitimacy that one could imagine.   If there were any doubt about it (and there would be none in the mind of most employees), the name of the manual dispels it, for it is nothing short of the official *policy* of the company, it is the Personnel *Policy* Manual.   As every employee knows, when superiors tell you "it's company policy," they mean business.

The mere fact of the manual's distribution suggests its importance.   Its changeability—the uncontroverted ability of management to change its terms—is argued as supporting its non-binding quality, but one might as easily conclude that, given its importance, the employer wanted to keep it up to date, especially to make certain, given this employer's good reputation in labor relations, that the benefits conferred were sufficiently competitive with those available from other employers, including benefits found in collective bargaining agreements. The record suggests that the changes actually made almost always favored the employees.

Given that background, then, unless the language contained in the manual were such that no one could reasonably have thought it was intended to create legally binding obligations, the termination provisions of the policy manual would have to be regarded as an obligation undertaken by the employer.   It will not do now for the company to say it did not mean the

things it said in its manual to be binding. Our courts will not allow an employer to offer attractive inducements and benefits to the workforce and then withdraw them when it chooses, no matter how sincere its belief that they are not enforceable.

Whatever else the manual may deal with (as noted above, we do not have the entire manual before us), one of its major provisions deals with the single most important objective of the workforce: job security. The reasons for giving such provisions binding force are particularly persuasive. Wages, promotions, conditions of work, hours of work, all of those take second place to job security, for without that all other benefits are vulnerable.

> We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for *all* of their income is something new in the world. *For our generation, the substance of life is in another man's hands.* [*F. Tanenbaum,* A Philosophy of Labor, 9 (1951), *quoted in* Blades, *supra,* at 1404.]

*See Pugh v. See's,* 116 *Cal.App.*3d 311, 320–21, 171 *Cal.Rptr.* 917, 921 (1981); *see also* Blades, *supra* at 1410 & n. 30 (right of discharge has been limited in collective bargaining agreements).

Job security is the assurance that one's livelihood, one's family's future, will not be destroyed arbitrarily; it can be cut off only "for good cause," fairly determined. Hoffmann-La Roche's commitment here was to what working men and women regard as their most basic advance. It was a commitment that gave workers protection against arbitrary termination.

Many of these workers undoubtedly know little about contracts, and many probably would be unable to analyze the language and terms of the manual. Whatever Hoffmann-La Roche may have intended, that which was read by its employees was a promise not to fire them except for cause.

Under all of these circumstances, therefore, it would be most unrealistic to construe this manual and determine its enforceability as if it were the same as a lifetime contract with but one

employee designed to induce him to play on the company's baseball team. *See Saverese, supra,* 9 *N.J.* at 597.[8]

## VII.

Having concluded that a jury could find the Personnel Policy Manual to constitute an offer, we deal with what most cases deem the major obstacle to construction of the terms as constituting a binding agreement, namely, the requirement under contract law that consideration must be given in exchange for the employer's offer in order to convert that offer into a binding agreement. The cases on this subject deal with such issues as whether there was a promise in return for the employer's promise (the offer contained in the manual constituting, in effect, a promise), or whether there was some benefit or detriment bargained for and in fact conferred or suffered, sufficient to create a unilateral contract; whether the action or inaction, the benefit or the detriment, was done or not done in reliance on the employer's offer or promise; whether the alleged agreement was so lacking in "mutuality" as to be insuffi-

---

[8]The contract arising from the manual is of indefinite duration. It is *not* the extraordinary "lifetime" contract explicitly claimed in *Savarese.* For example, a contract arising from a manual ordinarily may be terminated when the employee's performance is inadequate; when business circumstances require a general reduction in the employment force, the positions eliminated including that of plaintiff; when those same circumstances require the elimination of employees performing a certain function, for instance, for technological reasons, and plaintiff performed such functions; when business conditions require a general reduction in salary, a reduction that brings plaintiff's pay below that which he is willing to accept; or when any change, including the cessation of business, requires the elimination of plaintiff's position, an elimination made in good faith in pursuit of legitimate business objectives: all of these terminations, long before the expiration of "lifetime" employment, are ordinarily contemplated in a contract arising from a manual, although the list does not purport to be exhaustive. The essential difference is that the "lifetime" contract purports to protect the employment against any termination; the contract arising from the manual protects the employment only from arbitrary termination.

cient for contractual purposes—in other words, whether the fundamental requirements of a contract have been met.

We conclude that these job security provisions contained in a personnel policy manual widely distributed among a large workforce are supported by consideration and may therefore be enforced as a binding commitment of the employer.

In order for an offer in the form of a promise to become enforceable, it must be accepted. Acceptance will depend on what the promisor bargained for: he may have bargained for a return promise that, if given, would result in a bilateral contract, both promises becoming enforceable. Or he may have bargained for some action or nonaction that, if given or withheld, would render his promise enforceable as a unilateral contract. In most of the cases involving an employer's personnel policy manual, the document is prepared without any negotiations and is voluntarily distributed to the workforce by the employer. It seeks no return promise from the employees. It is reasonable to interpret it as seeking continued work from the employees, who, in most cases, are free to quit since they are almost always employees at will, not simply in the sense that the employer can fire them without cause, but in the sense that they can quit without breaching any obligation. Thus analyzed, the manual is an offer that seeks the formation of a unilateral contract—the employees' bargained-for action needed to make the offer binding being their continued work when they have no obligation to continue.

The unilateral contract analysis is perfectly adequate for that employee who was aware of the manual and who continued to work intending that continuation to be the action in exchange for the employer's promise; it is even more helpful in support of that conclusion if, but for the employer's policy manual, the employee would have quit. *See generally* M. Petit, "Modern Unilateral Contracts," 63 *B.U.L.Rev.* 551 (1983) (judicial use of

unilateral contract analysis in employment cases is widespread).[9]

Those solutions seem to be technically correct. Among the cases holding that the document in question satisfied technical contractual requirements are *Toussaint, supra,* 408 *Mich.* 579, 292 *N.W.*2d 880, and *Anthony, supra,* 51 *N.J.Super.* 139. In *Toussaint* one main issue was the contractual force of an oral assurance given to the employee when he was hired that he would not be discharged so long as he was "doing his job." In addition to that assurance, Toussaint was at the same time handed a manual, which provided that an employee would not be discharged without cause and without following certain procedures. The court noted in *dictum* that the oral assurance was not necessary to its holding. The court's discussion of the effect of distributing a manual is worth noting:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the

---

[9]Third-party-beneficiary doctrines might be used to confer the benefits on all workers; or the employer's offer could be construed as inviting acceptance in the form of continuance of work by merely one worker in order to benefit all.

Similarly, the doctrine of promissory estoppel could be relied on as a rationale for enforcement of an employer's promises in a policy manual or similar document under certain circumstances. Under the formulation set forth in the *Restatement (Second) of Contracts,* that doctrine renders binding a promise when the promisor should reasonably expect the promisee or a third party to act or forbear to act in reliance on the promise, if the promisee or third party does so and justice requires. *Id.* at § 590. However, we do not pass on the applicability of this theory here, as it was not raised by the parties and does not seem appropriate to the facts presented. See Note, 93 *Harv.L. Rev.* 1816, 1820 & nn. 21–22 (1980).

The doctrine of unconscionability of the Uniform Commercial Code, codified at *N.J.S.A.* 12A:2–302, is analogous to the employment-at-will rule. The unconscionability doctrine developed to protect the disadvantaged party in a one-sided bargain. *See generally* J. White and R. Summers, *Uniform Commercial Code* (2d ed. 1980) (courts refuse to enforce unconscionable contract clauses); S. Marrinan, "Employment At-Will: Pandora's Box May have an Attractive Cover," 7 *Hamline L.Rev.* 155, 193 (1984) (doctrine of unconscionability used to overcome unequal bargaining positions of contracting parties).

employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever, the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." [292 *N.W.*2d at 892 (footnotes omitted).]

A footnote concluded that "[i]t was therefore unnecessary for Toussaint to prove reliance on the policies set forth in the manual."

Similarly, in *Anthony v. Jersey Cent. Power & Light Co.,* *supra,* 51 *N.J.Super.* 139, practically every contractual objection that could be made here was disposed of by the Appellate Division in the context of a claim for pension rights by supervisory personnel based on a company manual (entitled "General Rules"). There, the defendant-employer argued that its severance-pay rule was a mere gratuitous promise, not supported by consideration. The court responded, analyzing the promise as an offer of a unilateral contract and the employees' continued services as sufficient acceptance and consideration therefor. *Id.* at 143. To the defendant's argument that there was no evidence of reliance upon its promise, the *Anthony* court responded that reliance was to be presumed under the circumstances. *Id.* at 145–46. We agree.[10]

---

[10]If reliance is not presumed, a strict contractual analysis might protect the rights of some employees and not others. For example, where an employee is not even aware of the existence of the manual, his or her continued work would not ordinarily be thought of as the bargained-for detriment. *See* S. Williston, *Contracts* §§ 101, 102A (1957). *But see* A. Corbin, *Contracts* § 59 (1963) (suggesting that knowledge of an offer is not a prerequisite to acceptance). Similarly, if it is quite clear that those employees who knew of the offer knew that it sought their continued work, but nevertheless continued without the slightest intention of putting forth that action as consideration for the employer's promise, it might not be sufficient to form a contract. *See* S. Williston, *Contracts* § 67 (1957). *But see Pine River, supra,* 333 *N.W.*2d at 627,

## VIII.

The lack of definiteness concerning the other terms of employment—its duration,[11] wages, precise service to be rendered, hours of work, etc., does not prevent enforcement of a job security provision.[12]  The lack of terms (if the complete manual is similarly lacking) can cause problems of interpretation about these other aspects of employment, but not to the point of making the job security term unenforceable.  Realistically, the objection has force only when the agreement is regarded as a special one between the employer and an individual employee. There it might be difficult to determine whether there was good

---

630.  In this case there is no proof that plaintiff, Woolley, relied on the policy manual in continuing his work.  Furthermore, as the Appellate Division correctly noted, Woolley did "not bargain for" the employer's promise.  The implication of the presumption of reliance is that the manual's job security provisions became binding the moment the manual was distributed.  Anyone employed before or after became one of the beneficiaries of those provisions of the manual.  And if *Toussaint* is followed, employees neither had to read it, know of its existence, or rely on it to benefit from its provisions any more than employees in a plant that is unionized have to read or rely on a collective-bargaining agreement in order to obtain its benefits.

[11]The parties agree that Woolley's employment was for an indefinite period. We therefore need not determine the impact of a job security clause where the employment is alleged to be for a fixed term, *e.g.,* because of the stated salary period.  *See Willis v. Wyllys Corp.,* 98 *N.J.L.* 180 (E. & A. 1922) (when employment contract states annual salary, the term of employment is not indefinite, but by the year).

[12]We do not agree with the distinction made by the courts below between a severance pay provision and the job security terms involved here, the former asserted to be specific, the latter too indefinite.  The Appellate Division, referring to *Anthony,* noting that it involved a severance pay provision, characterized that as "a specific term of a contract [whose] parameters are clearly set forth [where the] conditions and factors involved are definite and easily ascertained."  By contrast it referred to the "objections to a lifetime employment contract that make it contrary to public policy, *i.e.,* lack of definiteness, unequal burden of performance, etc.," referring to *Savarese, supra,* 9 *N.J.* at 600–01.  As implied above, we find that enforcing the provision that prohibits termination except for good cause is not so difficult as to warrant its invalidation on grounds of indefiniteness.

cause for termination if one could not determine what it was that the employee was expected to do. That difficulty is one factor that suggests the employer did not intend a lifetime contract with one employee. Here the question of good cause is made considerably easier to deal with in view of the fact that the agreement applies to the entire workforce, and the workforce itself is rather large. Even-handedness and equality of treatment will make the issue in most cases far from complex; the fact that in some cases the "for cause" provision may be difficult to interpret and enforce should not deprive employees in other cases from taking advantage of it. If there is a problem arising from indefiniteness, in any event, it is one caused by the employer. It was the employer who chose to make the termination provisions explicit and clear. If indefiniteness as to other provisions is a problem, it is one of the employer's own making from which it should gain no advantage. *Cf. In re Miller*, 90 *N.J.* 210, 221 (1982) (ambiguity should be resolved against party drafting contract).

Defendant expresses some concern that our interpretation will encourage lawsuits by disgruntled employees. As we view it, however, if the employer has in fact agreed to provide job security, plaintiffs in lawsuits to enforce that agreement should not be regarded as disgruntled employees, but rather as employees pursuing what is rightfully theirs. The solution is not deprivation of the employees' claim, but enforcement of the employer's agreement. The defendant further contends that its future plans and proposed projects are premised on continuance of the at-will employment status of its workforce. We find this argument unpersuasive. There are many companies whose employees have job security who are quite able to plan their future and implement those plans. If, however, the at-will employment status of the workforce was so important, the employer should not have circulated a document so likely to lead employees into believing they had job security.

## IX.

We therefore reverse the Appellate Division's affirmance of the trial court's grant of summary judgment and remand this matter to the trial court for further proceedings consistent with this opinion. Those proceedings should have the benefit of the entire manual that was in force at the time Woolley was discharged. The provisions of the manual concerning job security shall be considered binding unless the manual elsewhere prominently and unmistakably indicates that those provisions shall not be binding or unless there is some other similar proof of the employer's intent not to be bound. The ordinary division of issues between the court and the jury shall apply.[13] If the court concludes that the job security provisions are binding (or submits that issue to the jury), it shall either determine their meaning or, if reasonable men could differ as to that meaning, submit that issue as well to the jury. If either the court or the jury under those circumstances concludes that the Personnel Policy Manual constituted a promise that an employee in Woolley's position could not be fired except for good cause, the only issue remaining shall be Woolley's damages. Woolley need not prove consideration—that shall be presumed. *See supra* at 302. Furthermore, it shall not be open to defendant to prove that good cause in fact existed on the basis of which Woolley could have been terminated.[14] If the court or jury concludes that the manual's job security provisions are binding, then, according to those provisions, even if good cause existed,

---

[13]In his brief, Woolley took the position that the issue of existence of a contract and its proper interpretation were for the jury. As we view the matter, it may very well be that the court can make all of the determinations required. Woolley should not be deemed bound to that position taken at a time when the law concerning this matter had not previously been clarified.

[14]Again, in his brief Woolley's counsel contends that the issue of good cause should also be submitted to the jury. We do not believe that would be fair to Woolley's estate for the reasons stated above, and do not believe he should be bound by that position. We assume from the record that there is no claim of fraud, dishonesty, or anything similar.

an employee could not be fired unless the employer went through the various procedures set forth in the manual, steps designed to rehabilitate that employee in order to *avoid* termination. On the record before us the employer's failure to do so is undeniable. If that is the case, we believe it would be unfair to allow this employer to try now to recreate the facts as they might have existed had the employer given to Woolley that which the manual promised, namely, a set of detailed procedures, all for Woolley's benefit, designed to see if there was some way he could be retained by Hoffmann-La Roche. This is especially so in view of Woolley's death. Hoffmann-La Roche chose to act without complying with those procedures. It would not be fair now to allow the employer to claim that these procedures, of which it wrongfully deprived him, would have done him no good, when the only party who could effectively counter that claim—Woolley—is dead.

The damage issue in cases such as this is always difficult. At the very least it would seem to require a comparison between the salary Woolley would have received had he remained at Hoffmann-La Roche and that which he actually received before his death. *Rogozinski v. Airstream by Angell,* 152 *N.J.Super.* 133 (Law Div.1977), modified, 164 *N.J.Super.* 465 (App.Div.1979); *Gulf Consol. Int'l v. Murphy,* 658 *S.W.*2d 565 (Tex.1983). At oral argument counsel indicated that Woolley was unable to obtain any employment between the time he was fired and the date of his death. Counsel also suggested that there might be a claim for life insurance benefits that Woolley's survivors would have received had he not been fired. We leave those questions to the trial court.

## X.

We are aware that problems that do not ordinarily exist when collective bargaining agreements are involved may arise from the enforcement of employment manuals. Policy manuals may not generally be as comprehensive or definite as typical collec-

tive bargaining agreements. Further problems may result from the employer's explicitly reserved right unilaterally to change the manual. We have no doubt that, generally, changes in such a manual, including changes in terms and conditions of employment, are permitted. We express no opinion, however, on whether or to what extent they are permitted when they adversely affect a binding job security provision.

## XI.

Our opinion need not make employers reluctant to prepare and distribute company policy manuals. Such manuals can be very helpful tools in labor relations, helpful both to employer and employees, and we would regret it if the consequence of this decision were that the constructive aspects of these manuals were in any way diminished. We do not believe that they will, or at least we certainly do not believe that that constructive aspect *should* be diminished as a result of this opinion.

All that this opinion requires of an employer is that it be fair. It would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.

Reversed and remanded for trial.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POL-LOCK, O'HERN and GARIBALDI—7.

*Opposed* —None.

## APPENDIX

The following are the termination provisions included in the portion of the Personnel Policy Manual submitted to the courts below. ᐧ ᐧ'

## TERMINATION

### I. PURPOSE

This policy states the company's philosophy with respect to terminations of employees and provides uniform guidelines for the administration of this policy.

### II. POLICY

It is the policy of Hoffmann-La Roche to retain to the extent consistent with company requirements, the services of all employees who perform their duties efficiently and effectively. However, it may become necessary under certain conditions to terminate employment for the good of the employee and/or the company. The types of terminations that exist are lay-off, discharge due to performance, disciplinary discharge, retirement, and resignation.

### III. GENERAL

The definitions of the types of termination are as follows:

—<u>Layoff</u> means termination of employment on the initiative of the company under circumstances, normally lack of work, such that the employee is subject to recall. He/she may be reinstated without loss of seniority if recalled within one year of the date of layoff.

—<u>Discharge due to Performance</u> means termination of employment on the initiative of the company under circumstances generally related to the quality of the employee's performance, whereby the employee is considered unable to

meet the requirements of the job. In this case, the employee is not subject to recall or reinstatement.

—Discharge, Disciplinary means termination of employment on the initiative of the company for reasons of misconduct or willful negligence in the performance of job duties such that the employee will not be considered for re-employment.

—Retirement means termination of active work by the employee at the age or under conditions set forth in the company's retirement plan, under which the employee receives retirement pay and enjoys other benefits.

—Resignation means termination of employment on the initiative of the employee. Employees are expected to give no less than two weeks notice of resignation. An employee who resigns will retain no reinstatement or re-employment . rights.

Resignation requested is a category of information on the Personnel Action Form and means termination of employment, for cause, on the initiative of the company. "Mutual Agreement" terminations must be further identified as either discharge due to performance or disciplinary for purposes of severance pay eligibility (see Guidelines, pp. 10.2 and 10.3 and Severance Pay, pp. 10.4 and 10.5).

For pay purposes, terminations are effective on the last day worked, unless otherwise specified by the Department Head.

## IV. GUIDELINES FOR DISCHARGE DUE TO PERFORMANCE

In keeping with the company's concern for all employees, termination of employment on the initiative of the company under circumstances generally related to the quality of the employee's job performance deserves special consideration. We would like to insure that every reasonable step has been taken to help the employee continue in a productive capacity. It is the responsibility of each manager and supervisor to develop the people working for him/her. In cases of unsatisfactory job performance, which may develop into termination of employment, each manager and supervisor should consider the following:

A. Has the employee been made aware of the problem in specific terms?

B. Are the suggestions as to how these problems can be eliminated in writing?

C. Has assistance been offered to the employee to help the employee remedy the situation?

D. Has the employee been given a sufficient amount of time and help to remedy the situation?

If a situation related to poor job performance has just come to a manager's or supervisor's attention, joint evaluation between the employee and the manager is recommended. The manager should try to determine the cause of the problem. Is it lack of experience in the job, education, motivation, employee personal problems, or personality conflict? Once the cause is identified, the employee should be given time, if possible, to remedy the situation. The manager should also be considering ways to remedy the situation and to improve the individual's performance. This may mean the use of outside sources to develop the employee and/or the job to put the employee on an appropriate career path. Other alternatives are:

A. Changing the employee's responsibilities in his/her present job.

B. Reassignment to a different job in the department.

C. Encouraging the employee to bid into an area where his/her chances of success are felt to be better.

D. A change to a position of lesser responsibility.

If, after sufficient time and consideration of the above, the employee does not remedy the situation, the supervisor should then proceed with the termination of the employee (see VI below).

## V. GUIDELINES FOR DISCIPLINARY TERMINATIONS
(See section on Discipline 9.1 through 9.4)

The termination of any employee for disciplinary causes must follow the procedures as set forth in Section 9.1 through 9.4 of the Personnel Policy Manual.

## VI. TERMINATION PROCEDURE

It is the responsibility of the <u>manager</u> to:

—Notify the Payroll Department and the Personnel Department of the cause and date of termination;

—Notify the employee of the cause and date of termination;

—Prepare a Personnel Action Form stating the reason for termination and forward this to the Personnel Department.

It is the responsibility of the <u>Personnel Department</u> to:

—Provide the terminating employee with Termination Procedure Forms;

—Contact the terminating employee and set up an appointment for an interview (preferably the last day of work);

—Review Termination Procedure Forms for completeness and required clearance signatures;

—Notify the Dispensary, Payroll Department and Credit Union of the termination;

—Provide appropriate Unemployment Compensation information and forms to the terminating employee;

—Conduct appropriate follow-up correspondence with the company that the terminated employee has accepted employment, stating the continuing nature of the patent secrecy agreement. Copies of the letter should go to the employee and the Personnel file;

—Forward all termination procedure forms to the Personnel Department Record Room.

## It is the responsibility of the <u>Payroll Department</u> to:

—Verify that the terminating employee has no outstanding financial liabilities to the company;

—Issue and mail a final pay check upon completion of all termination procedures and receipt of a copy of the Personnel Action Form.

## It is the responsibility of the <u>HLR Federal Credit Union</u> to:

—Check the status of the terminating employee with respect to:
- · balances due the employee;
- · outstanding Credit Union loans;

and to make arrangements for an interview with the employee for purposes of proper disposition of any amounts due either the employee or the Credit Union.