

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-8-2006

# Holodak v. Rullo

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2141

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Holodak v. Rullo" (2006). *2006 Decisions.* Paper 225.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/225

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2141

ROBERT G. HOLODAK, JR.,
                              Appellant

v.

MARY RULLO; SONY ELECTRONICS, INC.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 01-cv-05371
District Judge:  The Honorable John C. Lifland

Submitted Under Third Circuit LAR 34.1(a)
November 7, 2006

Before: SCIRICA, Chief Judge, BARRY and ALDISERT, Circuit Judges

(Opinion Filed: November 8, 2006)

OPINION

BARRY, Circuit Judge

Robert Holodak appeals from an order of summary judgment entered against him.

We will affirm.

**I.**

Because we write for the parties, we mention only the facts pertinent to our decision.[1]  Holodak applied for a position as a Sales Representative at Sony in 1992.  The application he completed stated that employment would be "at will."[2]  He was hired as a Sales Representative, and after two years in that position, was promoted to Sales Manager.  Upon his promotion, he received Human Resources Guides.  The Forward to the Guides stated, "The Human Resources Guides are not a contract nor guarantee of employment."[3]  (App. at 53.)

---

[1] We will not consider factual issues Holodak has raised for the first time on appeal.  See Patterson v. Cuyler, 729 F.2d 925, 929 (3d Cir. 1984) ("This prudential policy seeks to insure that litigants have every opportunity to present their evidence in the forum designed to resolve factual disputes.").

[2] The application provided:

> I understand that this employment application and any other documents, including policies, handbooks, guidelines, practices, benefits or manuals, are not intended to create any contractual obligation which in any way conflicts with Sony Corporation of America's policy that the employment relationship between the Company and each employee is at-will and can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee.  I further understand that any oral or written statements to the contrary are expressly disavowed and should not and cannot be relied upon.  Exceptions to this policy may only be made with the prior written approval of the Executive Vice President, Human Resources.

(App. at 469.)

[3] Later in the Guides, it was stated:

> The employment relationship between the Company and its employees is "at will."  It is a relationship that can be terminated at any time for any reason by either party.  Notice may or may not be given by either party.  The relationship is not contractual.

In October 1999, Mary Rullo became Holodak's direct supervisor. Rullo and Holodak did not get along, and Holodak told her he was seeking a new position at Sony outside her division. Holodak also informed her he had decided to stop drinking.[4]

The next month, Sony announced the formation of a new division named e-Solutions. Initially, Go Kobayashi acted as its head. Kobayashi envisioned creating a liaison position between e-Solutions and the marketing organization at Sony and asked the President of Consumer Marketing, Fujio Nishida, if he could suggest candidates. Nishida, in turn, asked the President of Retail Sales, Anthony Piazza. Piazza met with Holodak and suggested that he speak with Nishida about the position.

During a meeting on December 10, Holodak lost his temper with two subordinates. He discussed the incident with Rullo, who chastised him and allegedly threatened to ruin his career. Holodak filed a formal complaint with Sony's Human Resources Department. The next day, Rullo met with Human Resources about Holodak. She mentioned that Holodak "was giving up drinking" or that he "was trying to give up drinking," and asked Human Resources to address this. Human Resources arranged for Holodak to attend a

> It is to be noted that Employment Applications, guidelines, policies, handbooks, manuals, benefit perquisites, compensation plans or other practices do not constitute a contract with the Company. Oral statements are disavowed and cannot be relied upon.

(App. at 63.)

[4] Holodak acknowledges having a problem with alcohol but states that he stopped drinking in June 1998 and began attending Alcoholics Anonymous meetings.

mandatory Employee Assistance Program ("EAP").[5]

On December 23, Nishida met with Holodak about the liaison position at e-Solutions, and they met a second time in mid-January. Nishida subsequently recommended Holodak to Kobayashi. The structure of e-Solutions, however, was in its formative stages, and Kobayashi never formally offered Holodak a position.

In February 2000, Sony named Robert Ashcroft to head e-Solutions in place of Kobayashi. Holodak advised Ashcroft that he had interviewed with Kobayashi and remained interested in a position at e-Solutions. Ashcroft agreed to speak with Holodak but told him he needed time to evaluate the needs of the new organization. He did not offer Holodak a position. According to Ashcroft, he knew nothing of Holodak prior to their meeting or of any problems Holodak might have been having with alcohol.

The organizational structure Ashcroft eventually created for e-Solutions did not contain the liaison position Kobayashi had contemplated. It did, however, include a director-level sales position, a job Holodak contends corresponds substantively to the liaison position.

In May 2000, Holodak received his performance review for the prior year by telephone. Rullo allegedly scheduled it for 5:00 a.m. PST on a day she knew Holodak would be in California. In July 2000, Holodak found a position with a company called

_____

[5] While EAP is a benefit designed to assist Sony employees and ensure continued employment, EAP participants may not pursue transfers or promotions for a period of six months.

WebMiles and resigned from Sony.

## II.

Holodak filed suit in the United States District Court for the District of New Jersey against Sony and his supervisor, Rullo, alleging five separate causes of action. Sony and Rullo filed a motion for summary judgment, and Holodak cross-moved for summary judgment on four of the counts. The District Court granted defendants' motion for summary judgment and denied Holodak's cross-motion.

Holodak now appeals. He alleges that the District Court erroneously granted summary judgment to Sony on his claim under the Americans with Disabilities Act and his claim for breach of the implied covenant of good faith and fair dealing.

We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a District Court's conclusions of law, and review its findings of fact for clear error. Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co., 316 F.3d 431, 443 (3d Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the facts in the light most favorable to the party opposing the motion.[6]

## III.

_____

[6] Because we are required to assume that all of Holodak's factual allegations are true, we need not address his argument that the District Court made erroneous findings of fact.

The facts alleged by Holodak are insufficient, as a matter of law, to support a claim of discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213; indeed, Holodak has failed to establish the elements of even a prima facie case of discrimination. Even if he had, however, Sony has offered legitimate, non-discriminatory justifications for the company's treatment of him, and he has not shown that these justifications were pretextual.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A qualified individual with a disability is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Holodak's claim under the ADA appears to be that Rullo told Human Resources he had a drinking problem, and that as a result of her statements, he was forced into EAP and others were led to believe that he was an alcoholic, thereby derailing his candidacy for a position within e-Solutions.

The familiar analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for resolution of suits brought under Title VII guides the resolution of claims brought under the ADA. Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d

6

Cir. 1995).  The <u>McDonnell Douglas</u> analysis proceeds in three stages.  As applicable here, Holodak must first establish a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  If he succeeds in establishing a prima facie case, the burden shifts to Sony "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  <u>Id.</u>  If Sony meets this burden, Holodak must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination.  <u>Id.</u> at 804-5.  The ultimate burden of persuading the trier of fact that Sony intentionally discriminated against him remains at all times with Holodak.

To establish a prima facie case of discrimination, Holodak was required to show that (1) he is a member of a protected category; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants.  <u>McDonnell Douglas</u>, 411 U.S. at 824.

As to prong one, the ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Holodak invokes the "regarded as" definition of disability.  An individual is "regarded as" having a substantially limiting disability when his employer believes he has an impairment that limits him in major life activities.  <u>Sutton v. United Airlines, Inc.</u>, 527 U.S. 471, 489 (1999).

While alcoholism can, we believe, rise to the level of a disability, there is no

7

evidence that Ashcroft perceived Holodak as having a drinking problem. Ashcroft testified not only did he not know that Holodak had participated in EAP, but he did not know that Holodak was or was known to be an alcoholic. "An employer cannot be said to have regarded an individual as disabled when the person charged with making the adverse employment decision lacked knowledge of the employee's condition." Olson v. GE Astrospace, 101 F.3d 947, 953 (3d Cir. 1996) (internal quotation marks omitted); see also Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002) ("[T]o establish discrimination because of a disability, an employer must know of the disability.").

We note as well that because Sony never created the liaison position, it did not "reject" Holodak or keep the job "open" for other "applicants." While Ashcroft did ultimately establish a director-level sales position, that position differed substantially from the liaison position. The sales position involved "develop[ing] a sales program and direct[ing] the sales force to achieve volume objectives for the organization's products" and "[t]rack[ing] sales performance against objectives and inform[ing] management of results." (App. at 17.) The occupant of the liaison position, in contrast, would have worked with product groups and the sales and marketing organizations at Sony in order to post product information online and forecast sales.

Even if Holodak had set forth a prima facie case, Sony came forward with nondiscriminatory reasons for its actions that Holodak was unable to discredit. See Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994). Summary judgment was properly granted.

8

**IV.**

Holodak's argument that Sony breached the implied covenant of good faith and fair dealing must also fail. Holodak worked for Sony "at will," without an employment contract. Generally, "[i]n the absence of a contract, there is no implied covenant of good faith and fair dealing." Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 433 (App. Div. 1990).

Regardless of whether employment is "at will," however, an implied obligation of good faith and fair dealing attaches to any contractual aspects of an employment relationship. Nolan v. Control Data Corp., 243 N.J. Super. 420, 429 (App. Div. 1990). Holodak contends that Sony management acted in bad faith by sending him to EAP against company policy, neglecting to investigate his complaints against Rullo, sabotaging his candidacy for a position within e-Solutions, and conducting his annual review at an inconvenient time. He argues that these actions violated contractual obligations derived from Sony's Human Resources Guides and a training program entitled "Civil Treatment for Managers."

To determine whether a contract can be implied from statements published in an employee handbook, we consider "the reasonable expectations of the employees." Woolley v. Hoffmann-La Roche, 99 N.J. 284, 298 (1985); Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 392 (1994). To do this, we must examine the definiteness and comprehensiveness of the policies as well as the context of the manual's preparation and distribution. Witowski, 136 N.J. at 392-93. A company, however, may prevent an

9

employment guide from creating an implied contract by including a "clear and prominent disclaimer." Woolley, 99 N.J. at 285; Nicosia v. Wakefern Food Corp., 136 N.J. 401, 412, (1994).

We conclude that the document at issue here did not rise to the level of contracts. It is significant, we believe, that Holodak signed a job application which stated, "I understand that this employment application and any other documents, including policies, handbooks, guidelines, practices, benefits or manuals, are not intended to create any contractual obligation . . . ." App. at 469. The Sony Human Resources Guides contained a prominent disclaimer providing that the "Human Resources Guides are not a contract . . . ." App. at 53. Furthermore, Sony neither authored the booklet entitled "Civil Treatment for Managers" nor adopted it as policy; Sony simply used it to train its employees. Under the circumstances, Holodak could not reasonably have expected statements found in these documents to be enforceable obligations. Because there was no contract, there was nothing into which a term of fair dealing could be implied.

### V.

We will affirm the order of the District Court.

10