John R. MALLON, Plaintiff,

v.

PRUDENTIAL PROPERTY & CASUAL-
TY INSURANCE COMPANY and Trav-
elers Insurance Company, Defendants.

Civ. A. No. 86–1847.

United States District Court,
D. New Jersey.

May 10, 1988.

Kunzman, Coley, Yospin & Bernstein by
Stephen O. Davis, Warren, N.J., for plain-
tiff.

Epstein Becker & Green by M. Elaine
Jacoby, Princeton, N.J., for defendant Pru-
dential Property and Cas. Ins. Co.

## OPINION

BISSELL, District Judge.

This matter arises out of a complaint filed in the United States District Court for the Western District of New York on January 7, 1986 by plaintiff John R. Mallon against defendant Prudential Property and Casualty Insurance Co. ("Prupac" or "company"). On May 12, 1986, that court granted defendant's motion to transfer this action to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1404(a). Two amended complaints have been filed in this action adding as additional defendants Aetna Casualty and Surety Company and Travelers Insurance Company. Both of these defendants, however, have been voluntarily dismissed by plaintiff pursuant to Federal Rules of Civil Procedure 41(a)(1).

Plaintiff's complaint arises out of his termination from employment by Prupac on January 9, 1985, at age 60. Mallon was initially hired by Prupac on March 29, 1976, when he was 52 years old. Before this, he had worked as a claims adjuster and investigator for almost twenty-five years. His first year of employment was spent as a casualty claims consultant in defendant's Linwood, New Jersey field claims office. He was then transferred at company request and expense to Prupac's newly opened Syracuse, New York field claims office, where he remained for the next seven years.

In May 1983, at company request and expense, plaintiff again relocated, this time to the company's main office in Holmdel, New Jersey. It is undisputed that prior to this time, Prupac had been experiencing problems with the handling of claims in the Holmdel office and the office was in need of someone who could handle claims and essentially clean things up. Within several months of this move, Mallon began to experience symptoms of stress and nervousness, which he contends were brought about by the backlog of claims and increased caseload of his new position.

These health problems eventually lead to plaintiff being placed on Prupac's short-term disability benefits plan for the next year. Plaintiff was thereafter terminated upon exhaustion of his short-term disability benefits.

In his complaint, Mallon seeks injunctive and monetary relief from defendant for its violations of federal and state law arising out of the termination of his employment. Plaintiff alleges that Prupac violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. because age was a determinating factor in discharging him rather than allowing him to return to work after his disability period expired. (Count One). In addition, plaintiff contends Prupac breached its contract of employment with him causing injury to his business reputation (Counts Two and Three), made false and fraudulent representations to induce him to accept employment (Count Four), and wrongfully discharged him in violation of public policy (Count Five).[1] Plaintiff's complaint contains a jury demand. Presently before the Court is defendant's motion for summary judgment on all counts of the complaint.

On a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. Id. at 2510. The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. Thus, the mere existence of some alleged factual dispute between the parties will not

---

1. Count Six of plaintiff's complaint alleges Travelers wrongfully interfered with plaintiff's contractual relations with Prupac. Since Travelers has been dismissed, this claim is no longer cognizable.

defeat an otherwise properly supported motion for summary judgment. *Id.* The Court must also consider the record in the light most favorable to the party opposing the motion. *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 404 (3d Cir.1981).

The language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). Yet, the burden of demonstrating the absence of material fact issues remains with the moving party on a motion for summary judgment, regardless of which party has the burden of persuasion at trial. Therefore, if the nonmovant bears the burden of persuasion at trial, the moving party, in order to meet its burden on a summary judgment motion, must show that the evidentiary materials of record would be insufficient to carry the nonmovant's burden of proof at trial. *See id.* at 2555.

### I. Count One: Age Discrimination Claim

Under the ADEA, the plaintiff-employee has the burden of proving that age was a determinative factor in defendant-employer's decision to dismiss the employee. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987) (*en banc*), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). This, however, does not mean the plaintiff must show that age was the sole consideration for his termination. Rather, the employee need only prove that "age made a difference in the decision." *Id.*

In a discrimination case, a plaintiff may, of course, establish his case with direct evidence that the employer acted with discriminatory motivation. Because of the inherent difficulty in acquiring direct evidence of employer motivation in employment discrimination suits, the Supreme Court has articulated a three-step method of proof that relies on presumptions and shifting burdens of going forward:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

This formula, first set forth in *McDonnell Douglas Corp. v. Green,* permits a plaintiff to rely, in the absence of direct evidence of discrimination, on a set of assumptions about the behavior of employers to establish the employer's intent to discriminate. This rationale was explained by the Supreme Court in the context of a race discrimination case:

> A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. See *Teamsters v. United States,* [431 U.S. 324,] 358 n. 44 [97 S.Ct. 1843, 1866, 52 L.Ed.2d 396] [ (1977) ]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.

*Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed. 2d 957 (1978). It follows from this understanding of human nature that a presumption of illegal age discrimination is raised when a qualified person in a protected age

group is discharged and replaced by someone sufficiently younger. *Chipollini*, 814 F.2d at 897–98. Therefore, an employee may establish a *prima facie* case of age discrimination indirectly by proving by a preponderance of the evidence that "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was dismissed dispite being qualified; and (4) he was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination." *Id.* at 897 (citing *Maxfield v. Sinclair International*, 766 F.2d 788, 793 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)).

If the plaintiff succeeds in proving a *prima facie* case of discrimination, the burden of production then shifts to the employer to produce admissible evidence of a legitimate nondiscriminatory reason for the discharge which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. After the defendant has met this burden, the presumption drops from the case, and the plaintiff must then prove by a preponderance of the evidence that defendant's proffered reason is a pretext for discrimination, that is, that the proffered reason is merely a fabricated justification for discriminatory conduct. *Id.* The plaintiff may carry this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1096.

Finally, in addition to establishing a *prima facie* case by indirect proof, an ADEA plaintiff can prevail by establishing, by means of indirect proof, that the defendant employer's reasons are pretextual without presenting evidence specifically relating to age. *Chipollini*, 814 F.2d at 898. "Thus, when all legitimate reasons for rejecting an [employee] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible

consideration such as [age]." *Furnco Construction*, 438 U.S. at 577, 98 S.Ct. at 2949 (emphasis in original).

While the ultimate burden at trial will remain with Mallon, the burden of persuasion on summary judgment remains unalterably with Prupac as movant. The employer has the task of persuading the court that even viewing all of the facts and reasonable inferences to be drawn thereform in the light most favorable to Mallon, no reasonable jury could find the employer intentionally discriminated against the plaintiff. However, if an employee introduces " 'evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge (which) reasonably *could* support an inference that the employer did not act for non-discriminatory reasons,' " the court may not grant an employer's motion for summary judgment. *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 203 (3d Cir.1987), *cert denied*, —— U.S. ——, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988) (quoting *Chipollini*, 814 F.2d at 900).

The plaintiff has made no attempt to establish his case with direct evidence that Prupac acted with discriminatory motivation. Instead both parties rely on the *McDonnell Douglas* method of proof in this case. Moreover, defendant makes no contention that Mallon has failed to establish a *prima facie* case under the *McDonnell Douglas* formula. The Court notes that it is undisputed that Mallon (1) was over 40 and thus belonged to the class of persons protected by the ADEA, (2) was employed as a casualty consultant in Prupac's Holmdel office and was qualified for that position when transferred to it from defendant's Syracuse office, (3) was discharged from the position and (4) was replaced by a younger individual, age 40, in March 1984. (*See* Mallon Dep at 66; Pl. App., Exh. X).

Under *McDonnell Douglas*, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for Mallon's dismissal, which plaintiff will have the ultimate burden of demonstrating is merely a pretext for discrimination. These last

two steps in the *McDonnell Douglas* method of proof are the focus of Prupac's motion for summary judgment. The defendant states its position as follows:

> Mallon cannot carry this burden [of proving defendant's proffered reasons are pretextual]. On the contrary, the undisputed facts of this case amply demonstrate that Prupac has always clearly stated its legitimate nondiscriminatory reason for his termination, that is, he exhausted the full year of short term disability benefits provided under the company's disability plan and was unable for medical reasons to return to his job as a claims consultant. Mallon has produced no indirect evidence to support an inference that this stated reason was pretextual in any way.

(Def.Brief at 20 (footnote omitted)).

Mallon, however, argues that the reasons for his discharge proffered by Prupac—his short-term disability benefits ran out—is a pretext for age discrimination because he requested to return to work almost six months before these benefits were exhausted. However, plaintiff admits that he indicated to Mr. Rizzo at Prupac that he "preferred not to return to his prior position because of the condition of the files and the nature of the work he was burdened with upon his transfer to Holmdel." (Pl.Brief at 23 (citing Rizzo Dep. at 49:8–20)). Nevertheless, plaintiff contends that Prupac's response, or lack thereof, to his attempt to return to work and avoid the exhaustion of his short-term benefits unequivocally shows they had no intention of having him return to work and are thus responsible for the expiration of his disability benefits.

■ The evidence of record, properly viewed in the light most favorable to the plaintiff and affording plaintiff the benefit of all reasonable inferences to be drawn from the evidence, supports the granting of defendant's motion for summary judgment. It is undisputed that plaintiff began experiencing symptoms of nervousness from the pressure of his job at defendant's Holmdel office in December 1983, about six months after he transferred. (Mallon Dep. at 70–71). Mallon's condition is set forth in a memo for the file written by Tony Rizzo, a personnel consultant at Prudential who plaintiff knew from his time in defendant's Linwood office, which states in part:

> On Monday December 19, 1983, at approximately 10:00 a.m., John Mallon came to my desk wanting to discuss a problem.
>
> He was visibly shaken, red faced, and shaking. I asked him what was wrong and he replied that he could not do his job. I asked him why and he said there was too much pressure and the volume was too much for him. He also indicated that he was no longer happy being here. I asked him what he meant by the volume being too heavy, as he had handled similar volume in previous assignments with the Company. He stated that the system in Holmdel is causing him problems. He gets the file from first report and has to handle all aspects to include collision, property damage, no fault and investigation. This is in addition to negotiating and settling the claim at the proper time. He also stated the phone never stops ringing and that he cannot get his work done. He stated that it has gotten to a point where both he and his desk are totally unorganized, and he doesn't know what to do next.
>
> He said that he wanted to transfer back to the Syracuse office as a Casualty Adjuster in the Buffalo area. I told him that I did not think there were any openings, but that he should put his transfer request in writing. He said he would do so.
>
> I then asked him if there was anything else that was bothering him. He replied that his wife wasn't happy here and that he was getting pressure from home.

(Def.App., Exh. L). This account is corroborated by plaintiff's own deposition testimony, in which he describes why he had become such a "nervous wreck":

> In the job [in Holmdel], when I first go there, as I said, the files hadn't been worked and so forth and there were numerous default judgments, everything. I mean they were in horrendous condition, and just getting into the piles, that

phone rung off the hook. I used to try and take if off the hook occasionally so I could get some work done, and the attorneys would ring through for another claim rep, and then tell that claim rep to call me. I even came in on Saturdays. Management level doesn't get paid for overtime. Beneath management level does, but I would drive up there on a Saturday when it was nice and quiet just trying to work some of them files without interruption, so I could go through them. It was just a mess. I would be on the phone and soon as I'd hang up, the phone was ringing again, just constantly. It was a very difficult situation.

\* \* \* \* \* \*

No bills had been paid. No no-fault had been paid. Property damage claims hadn't been paid. I'm not a property damage man, but the people would call the individual who's handling the file and then I would have to get property, would you please talk to these people, they're bugging me, and they'd call, When's my car going to be fixed? I mean, just constantly.

(Mallon Dep. at 152–53). In accordance with Mr. Rizzo's suggestion, plaintiff put in a request for a transfer back to Syracuse in December 1983. (*See* Def.App., Exh. M; Mallon Dep. at 156–57). In addition, plaintiff recounts that his state of mind was so poor at this time that he mentioned to his supervisor that he had been having thoughts of allowing his car to be rear-ended on the highway while driving to the office so he wouldn't have to go to work. (*Id.* at 157–58).

At defendant's suggestion, plaintiff took an early Christmas vacation in 1983. After returning on January 3rd and working until the 10th of the month, plaintiff stopped working until January 30th at the direction of his physician, Dr. Kouveliotes. (Mallon Dep. at 77). Mallon then returned to work on "short time," working only until 2:00 P.M. each day. Plaintiff claims that due to the situation he encountered upon his return, he was forced to stop work and go on short-term disability. Plaintiff describes this situation as follows:

Prior to the Plaintiff's return, his supervisors, Patruno, Haarten and Byron held a meeting wherein it was decided to give the Plaintiff a specified number of files which they felt he could realistically handle. (Haarten T92, 6–7.) Since the Plaintiff was returning on "short time" he would only be working until 2:00 p.m. each day. (Haarten T91,24 to 92,1.) This seriously limited his available time to work the necessary files. After having been out of work for almost three weeks, the Plaintiff was given several files upon his return which he had no knowledge of and does not recall having seen before.

Prior to his completion of those two files, it was decided by his superiors that he would be given several other files to work on. It was decided that he would be given "a couple of files ... four tops". (Haarten T92,10.) However, he was actually assigned six new files at 1:00 p.m. on the date following his return and ordered to complete all work necessary on those files [which contained thousands of documents] by 2:00 p.m. the following day. (Exhibit M.) Since he was "on short time" and had never seen these six files previously and as such had no idea as to what work needed to be done or how involved same would be, the Plaintiff asked Mr. Haarten what in fact would happen if he were unable to complete the work on those files by the following day. (MT234,20 to 235,6.) Mr. Haarten advised the Plaintiff that in that case he would "be given a warning and this (performance problem) could eventually lead to termination". (MT235,15–21).

(Pl.Brief at 7–8 (footnote omitted)). Defendant does not dispute that performance problems existed during this time and that it instituted procedures it felt would make plaintiff's work become satisfactory in a short period of time. (Def.App., Exh. O). Nonetheless, this time plaintiff's supervisor was still writing optimistic comments, such as "[w]ith his experience and track record he should be able to handle the work." (*Id.*) On January 2, 1984, plaintiff was sent to the Employee Health Service where

he was found to be anxious, suffering from high blood pressure and claiming that he feels unable to work. (Scotti Dep. at 29). Mallon was sent home and was placed on short-term disability, which paid him 90% of his salary.

In June, Dr. Kouveliotes was sent a letter from Prudential seeking information on the status of plaintiff's disability. At that time, the doctor remarked that plaintiff was not totally disabled and that there was a good prognosis for him returning to work if there was a change of jobs. (Pl.App., Exh. P). However, plaintiff concedes that at about this time, he was not attempting to go back to work. (Mallon Dep. at 88). At Prupac's request, Mallon was evaluated in July by a psychiatrist for verification of his disability, who concluded that he was disabled due to an anxiety disorder and "his [p]rognosis is guarded for his return to his usual occupation." (Def.App., Exh. R). The psychiatrist's recommendations were that requiring plaintiff to meet deadlines should be avoided for he is unable to function under stress and during crises and that "any job that will require handling [a] heavy caseload or making major decisions, will be detrimental to his mental health." (*Id.*)

Responding to an internal memo received from group life claims stating that Mallon could return to work if placed in a less stressful position and requesting a determination if such a position existed, Mr. Rizzo of defendant's personnel department called plaintiff in August to discuss the possibility of his returning to work. Rizzo, in memoralizing this conversation, states that plaintiff was receptive to the idea of returning to work "if the right position was available." (Def.App., Ex. T). He definitely would not and could not return to his prior position in Holmdel because of his health and the adverse effect it would have on him. (*Id.*) The two positions Mallon felt he would be successful at were a corporate claims analyst or a field casualty adjuster in the western New York area. (*Id.*) In early September Mr. Rizzo called plaintiff again, this time to discuss his returning to work as a casualty consultant in the Syracuse office where he had been before.

(Def.App., Exh. U). Mr. Rizzo claims one of the reasons for the offer was plaintiff's express desire to return to the western New York area and an immediate opening due to a recent resignation. (*Id.*) A company move plan was not part of this offer, however, because employees move at their own cost when the company is trying to accommodate an employee's desire to move, as opposed to a company-requested transfer. (*Id.;* see also Def.App., Exh. J). Plaintiff called the next day to turn down the position. Mr. Rizzo's notes from this phone call include the following comments:

> John advised me that he could not accept the offer. He further indicated that he spoke to his doctor who advised him that he could not return to this type of work because he felt John could not take the pressure of the position again. The doctor allegedly told him that this kind of pressure could bring on a heart attack or stroke.

> \*   \*   \*   \*   \*   \*

> John explained that based on [the medical reports of both his doctor and the one the company sent him to], he did not see how he could return to a Consultant's position, whenever it might be.

> I again explained that ... the Company was only trying to make a good effort to help him return to work. Also, that this offer was based on his August 30 conversation/comments that he wanted to return to the Syracuse area where he could be close to his family and be in a territory where he was comfortable. I quoted his comment from that conversation, "I am wired as I know every judge and attorney in the area." John acknowledged all of this, and seemed to understand, but indicated it would still be dangerous to his health to return to a Consultant's position.

> \*   \*   \*   \*   \*   \*

> John then stated that both his attorney and doctor advised him that his medical problem is compensable. He went on to explain that his doctor asked him why he was paying cash for his visits when the Company should be paying the bills.

He also asked me if I had ever handled Workmen's Compensation. I told him on a limited basis and asked him why. He said that his problem was causally related to the job and, therefore, compensable. However, at this time, he feels he is making out better under the disability program than he would under Workmen's Compensation. I did not reply.

\* \* \* \* \* \*

... I asked John what we could do for him, or more precisely, what did he want from us. John replied that he feels he should be medically disabled. He stated that he had two years until he could collect social security (62) and that he needed some income until then. He also said, "if I got medical disability, I would go away."

He asked me what I thought the Company could do for him. I told him I would pass on this information to my supervisors and we would have to go from there. John said, "There must be a thousand of these type cases in Prudential and what do they do." I explained I wasn't familiar with Prudential procedures in these types of matters, and that Prupac is a relatively young Company and has not had too many situations of this nature versus Prudential which is an established Company.

John asked if he would be "canned" when his disability ran out in January. I told John that the disability plan gives an employee with five years or more but less than ten years of service, 52 weeks of disability. When this expires, employees are normally terminated.

He said that if this happens, he will have no choice but to sue. He went on to say that his claim was compensable and he should receive medical disability after the 52–week period is up.

(Def.App., Ex. U; *see also* Rizzo Dep., 48–58). Plaintiff claims not that he turned down this offer of a position in Syracuse but that the parties were in a stalemate on the question of Prupac paying for the move. (Mallon Dep. at 99–100).

Plaintiff's claim for Workers' Compensation benefits was denied in late September 1984. Thereafter, plaintiff's counsel began corresponding with the defendant to determine "what the company has in store for him." (Def.App., Exh. W, letter of 10/11/84). In responding to this inquiry, defendant's vice-present for personnel wrote:

> Mr. Mallon's disability benefits will expire during January 1985. Under the provisions of the Company's Disability plan, described in the enclosed booklet, an employee is terminated when his or her Short Term Disability benefits are exhausted.
>
> It is my understanding that Mr. Mallon was offered his former position as Casualty Consultant in the Syracuse Field Claim Office, a position which he performed satisfactorily. I have been informed that, when Mr. Mallon declined that position, he indicated that there were no assignments within the Prudential Property and Casualty Insurance Company which he and his physician felt that he would be medically capable of assuming. Based on Mr. Mallon's assertion, we have ceased our efforts to secure him a suitable job placement.

(*Id.*, letter of 10/14/84). Plaintiff's counsel responded by expressing Mallon's desire to return to work for Prupac. (*Id.*, letter of 11/5/84). The company, in reply, reiterated its understanding, as communicated to it by the plaintiff, that there were no positions at Prupac which he could perform. (*Id.*, letter of 11/19/84). Nonetheless, defendant agreed, upon receipt of an indication from plaintiff's doctor of the specific limitations by which the company should be guided in seeking a position for him, to reactivate its attempt to find an appropriate placement. (*Id.*) This letter was in fact sent by Dr. Kouveliotes, who stated that plaintiff has "improved enough that he may handle a normal flow of business. It is my opinion that he should not be placed in as stressful of a position as he had been prior to his leaving that position." (Def.App., Exh. X). There is evidence in the record that after receipt of this letter, the company made a search of available positions, but found none. (Def.App., Exh.

Y; Pltf's App., Exhs. W and X; Harris Dep. at 25–35). By letter dated December 20, 1984, defendant informed plaintiff that "[a]fter considering all assignments, reasonably commensurate with your experience, it is our conclusion that none of these positions would be perceived as stress-free or less stressful than your prior position. All include heavy caseloads, deadlines and decision-making responsibilities—elements which your medical file indicates you should avoid." (Def.App., Exh. Y). Consequently, the letter concluded that the company had no option but to terminate plaintiff at the expiration of his short-term disability benefits on January 9, 1985. (*Id.*)

Mallon's explanation for why he believes the expiration of his disability benefits is a pretext can be found in his deposition testimony, in which he stated:

Q. In other words, you are saying that you found it hard to believe that there was no job available when you had had 33 years of experience. Is that correct?

A. That's correct.

Q. But you don't have any facts other than what you have told me about these people who have been hired since you were terminated?

A. I wasn't referring to them. I was referring to other things that I was capable of doing.

Q. Such as?

A. A field claim man.

Q. Do you know if there were any positions open for field claim men at the time of your termination?

A. No, I would have no knowledge of that.

Q. Well, are there any other facts that support your claim that you were discharged solely because of your age? Are there, Mr. Mallon, any facts that you know that support your claim that you were terminated because of your age rather than because your disability benefits had run out and there was no less stressful job to give you?

A. The only thing I can—the only conclusion I can draw with a person of my background and what I knew about this business and the way I did perform that is seems inconceivable for me to believe that they couldn't find any job in that company.

Q. And so the only other reason that you can conceive of is your age. Is that correct?

A. I believe so.

(Mallon Dep. at 119–20). The record does contain evidence that during December 1984 there was a vacancy in defendant's Bergenfield, New Jersey claims office. Ms. Harris of defendant's personnel department claims this job was not offered to plaintiff because it was the same job with the same duties he had in Holmdel and, thus, would have involved the same stresses as had caused plaintiff's earlier physical problems. (Harris Dep. at 35; Pltf's App., Exh. W).

Also worth noting are comments contained in a report by plaintiff's immediate supervisor in Holmdel, Frank P. (Pete) Hartten. Mr. Hartten, like plaintiff, was hired by Prupac in his mid-50's and was essentially the same age as plaintiff when they worked together in Holmdel. In a report dated August 1983, Mr. Hartten wrote, in reference to plaintiff: "Like old saying—can't teach old dogs new tricks, but I'm trying from 1 old dog to another. John seems to be confused with the big city." (Pltf's App., Exh. V). The memo then goes on to acknowledge positively plaintiff's desire to be concise and expresses concern that he may be experiencing burn-out. *Id.* Mr. Harttens' explanation of this comment was that "[plaintiff] was coming from New York, set in his ways and coming into New Jersey." (Hartten Dep. at 54). This sentiment is reiterated by one of plaintiff's other supervisors, Paul Patruno, who testified at his deposition that he recalled being informed that plaintiff was having a hard time accepting the way the Holmdel office wanted things done and was doing things the old way. (Patruno Aff. at 53). The comment as to the "big city" was meant to refer to the different volumes of files between the big city—Holmdel—and a rural area—Syracuse. (*Id.* at 56).

Finally, plaintiff testified at his deposition that the other factual support for his allegation that his discharge was motivated by age discrimination is the information he received from a friend still employed at Prupac who told him that a year or so after he left numerous new employees had been hired in his unit to beef it up, the oldest of whom is 39. (Mallon Dep. at 115–17). The position statement prepared by the company in response to plaintiff's claim to the State Division on Civil Rights states that during 1984, five individuals became casualty consultants in the Holmdel office, two of whom were additions to the staff as a result of the advent of the Joint Underwriting Association, one was an employee returning from maternity leave and two were replacements for employees who transferred or left the company. (Pltf's App., Exh. X). These five individuals were ages 40, 36, 34, 33 and 29. (*Id.*) The Court finds no other evidence in the record relevant to plaintiff's claim of age discrimination.

This Court concludes that the record in the instant action contains nothing more than simple accusations and mere speculation of age discrimination, which are insufficient to put Prupac's motivation in discharging plaintiff in issue. *See Pollock v. American Telephone & Telephone Long Lines,* 794 F.2d 860, 865 (3d Cir.1986). There is no direct evidence that defendant acted with discriminatory intent. There is also insufficient circumstantial evidence in the record from which a jury could reasonably infer that Mallon was not terminated because of the exhaustion of his short-term disability benefits, that such claims are pretextual and that age discrimination played a role in his discharge. Even viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, there is no evidence that would support an inference or from which a fair-minded jury could reasonably find that age was a factor in defendant's personnel action. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. The plaintiff has not met his burden of either directly persuading the Court that a discriminatory reason more likely motivated Prupac or indirectly showing that defendant's proffered explanation for plaintiff's discharge is unworthy of credence. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1096. Summary judgment must be granted in favor of defendant on plaintiff's ADEA claim where the plaintiff is unable to come forward with any evidence to show that the employer's reasons for his termination are pretextual or that age made a difference in the employer's decision to discharge plaintiff.

## II. Counts Two and Three: Breach of Contract Claims

■ Prupac seeks to have plaintiff's contract claims dismissed on the grounds that Mallon never entered into an express employment agreement and any implicit promise of indefinite employment contained in a personnel manual distributed by defendant to employees was not breached by the defendant.[2] In opposition to this motion, Mallon does not dispute the nonexistence of an express employment contract. (Mallon Dep. at 124). Instead, he argues that his claim of wrongful discharge is based on an implied contract under *Woolley v. Hoffmann–LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257, *mod. on other grounds,* 101 N.J. 10, 499 A.2d 515 (1985), in that the company's employment manual clearly sets forth Prupac's termination policy as to employees with performance problems, which it failed to follow in this case. Defendant, on the other hand, agrees the company personnel handbook sets forth company policies for employee discharges which it was not required to follow in the present case of an employee discharged for exhaustion of short-term disability benefits.

**2.** Defendant also seeks to have plaintiff's tort and contract claims dismissed for lack of definiteness on the grounds they contain a series of conclusory statements which do not allege the necessary factual elements of these causes of action. In addition to this motion being untimely, the Court finds it difficult to grant in light of the fact these claims are obviously sufficiently specific based on the complaint and subsequent discovery in this case for defendant to make and support a motion for summary judgment on these claims.

In the landmark case of *Woolley v. Hoffmann–LaRoche, Inc.*, the Supreme Court of New Jersey considered the issue of whether a personnel manual constituted a contract enforceable against an employer, where it purported to define the causes of termination and set procedural guidelines in cases of discharge for cause. The court held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even where the employment is for an indefinite term and would otherwise be terminable at will." 99 N.J. at 285–86, 491 A.2d 1257. In so holding, the court noted that "a policy manual that provides for job security grants an important protection for workers ... [which] an employer should be required to honor." *Id.* at 297, 491 A.2d 1257. However, the court made very clear that this implied contract was not meant to protect against any termination, but only to safeguard employment from arbitrary termination. *Id.* at 301 n. 8, 491 A.2d 1257.

The issue before this Court is twofold: (1) what were the grounds for plaintiff's discharge, and (2) whether this discharge was in violation of clearly laid out provisions in the employee manual for discharge due to performance. Keeping in mind that on a motion for summary judgment a court may not resolve genuine issues of material fact, the Court grants defendant's motion for summary judgment on plaintiff's *Woolley* claims.

Two employee manuals are important to this Court's analysis. The first is Prudential's disability benefits booklet which states under the section on short-term disability benefits that "[y]our service will terminate when your short term disability benefits are used up." (Def.App., Exh. P at 6). The other is defendant's *Personnel Policies and Practices Manual*, which states in its "Forward" that it applies to all employees. (Pl.App., Exh. Y). The sections of the manual on performance problems generally state the company's goal of trying to retain and develop employees, even those whose performance is unsatisfactory or who express dissatisfaction with the job. (*Id.* at 5–A). On the topic of termination, other than termination because of expiration of disability benefits payments, there are only two types of dismissals discussed in the manual—summary dismissal and progressive discipline. The latter, which plaintiff argues should have been used in his case, allows dismissal only after warning and notification procedures and attempts at rehabilitation over a period of time have failed. The progressive discipline policy involves a four-step process—routine performance feedback, first warning, final warning and termination—"designed to improve an employee's overall performance to a satisfactory level." (*Id.* at 5–C).

Plaintiff admits in his brief that his supervisors were of the overwhelming opinion that he had performance problems upon his transfer to the Holdmel office. Consequently, plaintiff argues that these statements show that the company's progressive discipline procedures should have been implemented in his case. To some extent the Court agrees with the scenario painted by the plaintiff. However, the Court finds the record is clear that plaintiff's performance problems were secondary and possibly the manifestation of a larger problem which was the predominent reason for his discharge, his anxiety disorder which led to his disability. This is consistent with the company's revised termination policy which recognizes performance problems as a manifestation of physical illness, with the latter being treated in the first instance:

> In all of the situations which may lead to termination, it is important to make certain that the underlying reason for failure to meet satisfactory standards is neither illness which could be corrected with the help of our Medical Department of Employee Health Service facilities, nor illness that should be handled under the Disability Benefits Plan. This applies not only to cases of failure to meet attendance standards, but also to cases of failure to meet standards of performance and conduct, which can also be caused by illness.

(Pl.App., Ex. T at 2–3). Had plaintiff not gone out on disability or had he returned to the company, most likely the progressive disciplinary procedures would have been implemented in his case. But there is no question that on the present record any performance problems plaintiff was experiencing were superseded by his medical disability and thus the disability benefits booklet, which states that an employee is to be discharged upon expiration of his short-term benefits applies here, and not the company's progressive discipline termination procedures.

For the reasons set forth above, defendant's motion for summary judgment on plaintiff's breach of contract claim arising under *Woolley v. Hoffmann–LaRoche* is granted as defendant complied with all company policies for employees discharged for exhaustion of short-term disability benefits.

### III. Count Four: Fraudulent Misrepresentation Claim

■ In Count Four of his amended complaint, plaintiff alleges the following:

29. On or about March 29, 1976, and continuing thereafter the Prudential falsely and with intent to defraud the Plaintiff represented to the Plaintiff that he would remain in their employ if he continued to perform the duties required of him pursuant to the Employment Contract.

30. Such representations were false in fact and known to be false by Prudential at the time they were made.

31. Plaintiff relied upon these representations and was thereby induced to accept employment with Prudential.

(Complaint at ¶¶ 29–31). Defendant's move to dismiss this Count on the grounds that plaintiff stated at his deposition that he cannot point to any false statement or misrepresentation made to him by defendant which induced him to accept the position in Holmdel.[3] In reply, plaintiff is characterized as having been "obviously confused or under a misapprehension" at his deposition and thus this testimony should not bar his claim because the other facts testified to by him establish his claim of fraud. (Pl.Brief at 46). Plaintiff asserts that the basis for his fraud claim is that "to induce [him] to make that transfer [from Syracuse to Holmdel], various promises were made to him which never came to fruition and which it can be inferred the Defendant never intended to allow to come to fruition." (*Id.* at 47).

Under New Jersey law, "a misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981). Ordinarily, an action for misrepresentation cannot be predicated upon matters *in futuro*. *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J.Super. 369, 380, 164 A.2d 607 (App.Div.1960). However, "a false representation of an existing intention, *i.e.*, a 'false state of mind' with respect to a future event or action has been held to constitute actionable misrepresentation." *Capano v. Borough of Stone Harbor*, 530 F.Supp. 1254, 1264 (D.N.J. 1982) (citing *Samatula v. Piechota*, 142 N.J.Eq. 320, 323, 60 A.2d 86 (Ch.Div.1948)). To have a "false state of mind" the defendant must have no intention at the time he makes the representation of fulfilling the promise. This lack of intention can be established by circumstantial evidence of subsequent acts and subsequent events or by evidence the representation was impossible to fulfill based upon contingencies or circumstances known to the promisor at the time the statement was made but unknown to the promisee. *Ocean Cape Hotel*, 63 N.J.Super. at 381, 164 A.2d 607. This burden is not met by mere proof of nonperformance; failure to perform does not impose on the promisor the burden of show-

---

**3.** The focus of this claim appears to be misrepresentations made to plaintiff about the move to Holmdel, although plaintiff alleges the misrepresentations began at the time he was initially employed by defendant.

ing his nonperformance was due to circumstances arising after the making of the agreement. *Id.* at 382, 164 A.2d 607.

Defendant's motion is based almost exclusively on statements from plaintiff's deposition, at which he testified as follows:

Q. Mr. Mallon, what facts do you know to support the claim that on March 29th, 1976, and thereafter during your employment Prudential made false and fraudulent statements or representations to you so you would continue to remain employed if you continued to perform the duties required of you?

A. Well, I can't say they did.

Q. You can't say that they did make false statement. Is that what you are saying?

A. That's correct.

Q. Then there is no basis for this count of your complaint?

A. I agree with you.

(Mallon Dep. at 192–93). While plaintiff's answers are quite damaging to his fraud claim, the Court is mindful of his argument that these questions called for legal conclusions, the significance of which plaintiff should not have been expected to fully understand. However, because plaintiff's claim fails as a matter of law, the Court need not get embroiled in the significance of this testimony.

The statements of defendant which plaintiff relies on his his fraud claim are those made to him on his visit to Holmdel, which included comments such as "this is the home office, this is where your future can really lie" and "we really need you down here." In addition, plaintiff claims there were representations that this job would include out-of-office activities such as going to court or pretrial conferences and that the position allowed for the possibility of advancement. (*See* Pl.Brief at 47–9). These representations of future action are alleged by plaintiff to have been made under a false state of mind "[s]ince the condition and number of files the plaintiff undertook essentially negated any possibility of trial or settlement conference appearances," thereby making these representations unrealistic, implausible and fraudulent. (*Id.* at 51). In the same paragraph, plaintiff acknowledges that these were in fact "long term possibilities." (*Id.*)

This Court cannot agree with the plaintiff that these representations of what possibilities could be in store for plaintiff's future were made by defendant knowing they would never come to fruition. Plaintiff points to no evidence in the record from which this Court could reach a contrary conclusion, nor can the Court find any such evidence. Rather, it is clear from plaintiff's own testimony that he knew he would be taking over another employee's pending work and that these files had not been worked on for some period of time. (Mallon Dep. at 141). It was made clear that help was needed in that unit at the time they were discussing transfer with him. (*Id.* at 139). There is no evidence to support plaintiff's promises of future advancement and out-of-office activities were known to be impossible to fulfill at the time made by defendant. Nor have any subsequent acts or events been pointed to from which the Court could draw such an inference. The defendant was clearly aware of the condition of the Holmdel office and made this known to plaintiff. Defendant's representatives could not possibly have known that defendant, an experienced claims consultant with a good track record, would not work out in that position. Therefore, this Court finds defendant did not misrepresent its present intentions. Moreover, there is more than enough evidence in the record to show that any nonperformance of the defendant was due to circumstances arising after the making of the agreement and out of defendant's control. Accordingly, defendant's motion for summary judgment on plaintiff's fraud claim is granted.

## IV. Count Five: Wrongful Discharge in Violation of Public Policy Claim

Count Five of plaintiff's complaint alleges that his discharge was "for reasons which in no way reflect a proper business decision of Prudential, and are a violation of Prudential's duty not to discharge an

employee for reasons which violate public policy." (Complaint at ¶ 34). Defendant assumes, and this Court believes properly so, that plaintiff is alleging a cause of action under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), in Count Five of his complaint. Defendant contends that this Count, purporting to state a cause of action under *Pierce* for wrongful discharge in violation of public policy must be dismissed because Mallon fails to identify a clear mandate of public policy violated by defendant's actions. In making its motion defendant relies on Mallon's deposition testimony in which he stated that the public policy he believes defendant violated was the fact "Prudential purports to the public ... they're a good company ... and they do like a good image with the public, and one should be able to feel secure with them.... I mean if you've done a great job for them, I just don't think they were right, and I don't think I was treated fairly." (Mallon Dep. at 201). In his opposition, plaintiff asserts that he was terminated "as a result of filing a workers' compensation claim and essentially of being temporarily unable to work due to a compensable condition," in violation of public policy.

The Supreme Court of New Jersey has recognized a common law claim for wrongful discharge when an employee is discharged contrary to a clear mandate of public policy. *Pierce*, 84 N.J. at 71, 417 A.2d 505. *Pierce* and its progeny have all dealt with factual circumstances where the plaintiff's employment with the defendant was terminated—either voluntarily or involuntarily. The court in *Pierce* held that "[i]f an employee does not point to a clear expression of public policy, the court can grant a motion to dismiss or for summary judgment." *Id.* at 73, 417 A.2d 505.

Discharge of an employee in reltaliation for filing a workers' compensation claim was found actionable under the type of cause of action recognized under *Pierce* in *Lally v. Copygraphics*, 85 N.J. 668, 428 A.2d 1317 (1981). In recognizing this new cause of action, the Supreme Court of New Jersey reasoned:

In particular we endorse the conclusion of the Appellate Division that there exists a common law cause of action for civil redress for a retaliatory firing that is specifically declared unlawful under [New Jersey's Workers' Compensation law], N.J.S.A. 34:15–39.1 and 39.2. The statutory declaration of the illegality of such a discharge underscores its wrongful and tortious character for which redress should be available. Such a cause of action is strongly founded in public policy which, in this case, is reflected in the statutory prohibitions themselves. See *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 66–73 [417 A.2d 505] (1980). Moreover, the penal and administrative remedies that are provided by N.J.S.A. 34:15–39.1 and 39.2 to rectify this form of illegal employment practice will clearly be augmented by recognition of an alternative or supplemental judicial right to secure civil redress. A common law action for wrongful discharge in this context will effectuate statutory objectives and complement the legislative and administrative policies which undergird the workers' compensation laws.

85 N.J. at 670–71, 428 A.2d 1317. The facts involved in *Lally* were that the plaintiff was an employee of defendant when she sustained minor injuries to her right eye and left foot in a work-connected injury. When plaintiff presented her employer with the bills from her medical treatment, she alleges her employer advised her that if she persisted in making "this kind of trouble" by attempting to obtain workers' compensation benefits, she would be discharged. She in fact persisted and was subsequently discharged. *See* 173 N.J.Super. 162 at 166–67, 413 A.2d 960.

The application of the *Lally* doctrine to a situation factually analogous to that presently before the Court occurred in *Galante v. Sandoz, Inc.*, 192 N.J.Super. 403, 470 A.2d 45 (Law Div.1983), *aff'd*, 196 N.J.Super. 568, 483 A.2d 829 (App.Div.1984), *certif. granted*, 101 N.J. 231, 501 A.2d 909 (1985), *appeal dismissed*, 103 N.J. 492, 511 A.2d 665 (1986). In December 1980, plaintiff Galante, a mall route truck driver, employed at will by the defendant, stepped in

an oil spill on defendant's premises, and fell and injured his back. Just prior to this time, the company had instituted an absence control policy in order to curb chronic absenteeism. Under this policy, absences are computed in terms of "instances" with one instance being the total consecutive days an employee is out of work at one time. Upon reaching nine instances an employee will be fired. After his back injury, Galante was out of work 11 instances, missing a total of 44 days. While the employer acknowledged some of these absences were due to plaintiff's work-related injury, which would be taken into consideration, he was nonetheless terminated. Although it was established that eight of the 11 absences were due to plaintiff's back injury, the parties agreed that Galante's dismissal was solely the result of his absenteeism, deemed excessive under the new policy. One of the arguments asserted by plaintiff was that his firing based on absenteeism occasioned by a work-related injury was wrongful under *Lally*.

To prove a *prima facie* case of retaliatory discharge under *Lally*, the *Galante* court held that an employee must prove "(1) that he made or attempted to make a claim for workers' compensation; and (2) that he was discharged in retaliation for making that claim." 192 N.J.Super. at 407, 470 A.2d 45. There was no question in *Galante* that the plaintiff had filed a claim for workers' compensation, but the court found the plaintiff failed to offer any evidence that his termination, predicated upon the company absenteeism policy, was a retaliatory move on the part of his supervisors. *Id.* at 408, 470 A.2d 45. Rather, the evidence showed Galante was terminated over eight months after he filed his claim, his supervisor was unaware of the workers' compensation claim, and there was no proof the claim for benefits had entered into the defendant's decision to discharge him. *See* id. at 407–08, 470 A.2d 45.

In granting summary judgment for the defendant, the court in *Galante* distinguished its case from *Lally* in that the record in the latter case contained evidence of a discriminatory discharge. In *Galante*, on the other hand, "even the employee acknowledged that he was not fired because he sought benefits from workers' compensation." (*Id.*)

Unlike *Lally*, the instant action is not a case where an employee has been intentionally singled out by his employer for discharge for seeking workers' compensation benefits. Rather, like *Galante*, the present case deals with an employer's enforcement of a neutral, written company policy on disability.

While there is no dispute plaintiff filed for workers' compensation benefits, there is also no evidence in the record that the defendant was retaliating for plaintiff's having filed a workers' compensation claim. In fact, Prupac does not handle its own workers' compensation claims; they are handled by The Travelers Insurance Company, defendants' workers' compensation carrier. (*See* Def.App., Exh. V). Moreover, plaintiff's claim of alleged retaliation would have more of a logical basis if plaintiff was in fact awarded such benefits, but that is not the case here.

Mallon, in opposition to this motion, has come forward with not a scintilla of evidence in support of his claim, only statements that the defendant acknowledged his anxiety disorder was connected to his work. It appears as though plaintiff is really challenging his denial of workers' compensation benefits and the company's refusal to extend his short-term disability benefits, neither of which is properly before this Court. The basis for the plaintiff's argument is that "defendant asserts that plaintiff was discharged because of exhaustion of his short term disability benefits which essentially amounts to defendant terminating the plaintiff for exercising his right to benefits brought on by a compensable illness." There is no question plaintiff misreads *Lally*. Without any specific evidence showing plaintiff's discharge was in retaliation for his having filed for workers' compensation benefits, defendant's motion for summary judgment must be granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is

granted and plaintiff's complaint is dismissed in its entirety.